Richard J. Cooper, Esq.
Thomas S. Kessler, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the Foreign Representative*
*of Samarco Mineração S.A. - Em Recuperação Judicial*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Samarco Mineração S.A. - Em Recuperação Judicial,[1]<br><br>Debtor in a Foreign Proceeding | Chapter 15<br><br>Case No. 21-10754 |

**VERIFIED PETITION FOR RECOGNITION OF THE**
**BRAZILIAN RJ PROCEEDING AND MOTION FOR ORDER GRANTING**
**RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1515, 1517, 1520 AND 1521**

Cristina Morgan Cavalcanti (the "Petitioner" or the "Foreign Representative"), the

foreign representative of the judicial reorganization (*recuperação judicial* or "RJ") proceeding

(the "Brazilian RJ Proceeding") of Samarco Mineração S.A. - Em Recuperação Judicial

("Samarco" or "Debtor") in the 2nd Business State Court for the Belo Horizonte District of

Minas Gerais (the "Brazilian Court") pursuant to Brazilian Federal Law No. 11,101 of February

9, 2005, as modified (the "Brazilian Bankruptcy Law"), of the laws of the Federative Republic of

Brazil ("Brazil"), by and through the undersigned counsel, respectfully submits this *Verified*

*Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related*

---

[1]    The last four identifying digits of the Brazilian tax number for the Debtor are (Brazil – 01-61).

*Relief Pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521* (the "Verified Petition"). This Verified Petition is filed in furtherance of the *Official Form Petition* (together with this Verified Petition, the "Petition") filed contemporaneously herewith and hereby requests that the Court enter an order substantially in the form attached hereto as Exhibit A (the "Proposed Order") pursuant to sections 1515, 1517, 1520 and 1521 of title 11 of the United States Code (the "Bankruptcy Code"): (i) commencing a case for the Debtor under chapter 15 of the Bankruptcy Code ancillary to the Brazilian RJ Proceeding (the "Chapter 15 Case"); (ii) granting recognition of the Brazilian RJ Proceeding pursuant to section 1517 of the Bankruptcy Code as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) of the Debtor, and all relief included therewith as provided in section 1520 and related relief under section 1521(a)(1)–(2) of the Bankruptcy Code;[2] (iii) recognizing the Petitioner as the "foreign representative" (as defined in section 101(24) of the Bankruptcy Code) of the Brazilian RJ Proceeding for the Debtor for purposes of the Chapter 15 Case; and (iv) granting such other and further relief as the Court deems just and proper.

In support of this request, the Petitioner relies upon and incorporates by reference: (i) the *Declaration of Cristina Morgan Cavalcanti in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and First Day Pleadings* (the "Morgan Declaration"); and (ii) the *Declaration of Fábio Rosas in Support of Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding* (the "Brazilian Counsel Declaration"), both filed concurrently herewith. In further support of this Verified Petition, the Petitioner respectfully represents to the Court as follows:

---

[2]   Alternatively, should the Court decline to recognize the Brazilian RJ Proceeding as the foreign main proceeding for the Debtor, the Petitioner respectfully requests that the Court recognize such proceeding as a foreign nonmain proceeding (as defined in section 1502(5) of the Bankruptcy Code), and grant appropriate relief.

## PRELIMINARY STATEMENT

1.     On April 9, 2021 (the "RJ Petition Date"), the Debtor filed a voluntary RJ petition (the "RJ Petition")[3] with the Brazilian Court under the Brazilian Bankruptcy Law.  On April 12, 2021, the Brazilian Court entered an order formally accepting the Debtor into the Brazilian RJ Proceeding (the "RJ Acceptance Order").[4]  The Debtor presently is operating its business under the judicial supervision of the Brazilian Court.

2.     Samarco is a privately held Brazilian mining company that started its operations in 1977.  In 2011, before its operations were suspended as a result of the Fundão Dam Rupture (discussed below), Samarco was the fourth largest exporter in Brazil according to the Brazilian Ministry of Development, Industry and Foreign Trade.  The company's main product, iron ore pellets, is one of the raw materials used in the fabrication of steel.

3.     Samarco is incorporated and headquartered in Belo Horizonte (the capital of the State of Minas Gerais), Brazil, and has two operating units, the Germano complex (the "Germano Complex") and the Ubu complex (the "Ubu Complex"), which are located in the adjoining Brazilian States of Minas Gerais and Espírito Santo, respectively.

4.     BHP Billiton Brasil Ltda. ("BHP Brasil") and Vale S.A. ("Vale" and, together with BHP Brasil, the "Shareholders") are the only shareholders of Samarco, each holding 50% of the shares in the company.

5.     As described further below, Samarco's current financial distress stems principally from a tragedy on November 5, 2015, when a tailings dam owned by Samarco at the Germano

---

[3]     A true and correct copy of the RJ Petition, along with a certified English translation, is attached hereto as Exhibit B.

[4]     A copy of the translated RJ Acceptance Order, along with a certified English translation, is attached hereto as Exhibit C.

Complex in the municipality of Mariana, State of Minas Gerais, Brazil, failed (the "Fundão Dam Rupture").  Immediately after the Fundão Dam Rupture, Samarco's permits to operate in Minas Gerais were suspended, and the company temporarily stopped all its mining operations.  In the wake of the Fundão Dam Rupture, Samarco concentrated its efforts on managing the crisis and its impact, including through significant social and environmental remediation initiatives.  Due to the cessation of its mining operations, by August 2016, Samarco was forced to suspend payments related to its financial indebtedness (discussed further below).

6.        Due to the economic impact of the Fundão Dam Rupture on Samarco, including the costs associated with remediation measures and the limitations associated with the extended suspension of its mining operations, Samarco cannot support its current level of financial indebtedness.  As a result, beginning shortly after the Fundão Dam Rupture, Samarco has been taking steps to evaluate and implement an operational restructuring of its business and preparing for what it hoped would be a consensual restructuring of its financial indebtedness.  These steps included taking actions to restart certain of its facilities and to complete and finalize its business plan.  As part of these efforts, from 2016 through 2019, Samarco engaged in discussions with certain groups of creditors, including presenting an updated business plan to certain creditors.  In 2020, Samarco commenced providing certain financial and operational data to certain technical and financial advisors to an ad hoc group of financial creditors.  In late 2020 and early 2021, Samarco began negotiating the terms of a non-disclosure agreement, various expense reimbursement agreements and a short term standstill agreement with legal advisors to the same group of creditors with the objective of entering into debt restructuring negotiations.  Notwithstanding these efforts, certain holders that were part of the ad hoc group brought enforcement actions against Samarco in Brazil and in the United States, which have resulted in a

freeze of Samarco's financial assets in Brazil. Following these actions, the company determined

to cease discussions with the ad hoc group. On April 9, 2021, Samarco had no choice but to

commence the Brazilian RJ Proceeding in order to, among other things, stay such enforcement

actions, protect its assets and operations, continue to employ thousands of workers, and have the

opportunity to continue to negotiate and implement an orderly restructuring of its financial

indebtedness.

7.      The Brazilian RJ Proceeding is intended to allow Samarco to re-establish its

capital structure and become a sustainable standalone company with debt levels suitable for it to

rebuild its business, provide employment for nearly 1,600 direct workers, and continue to

support local stakeholders. The Brazilian RJ Proceeding does not impair Samarco's obligations,

commitments or ability to make full redress for the Fundão Dam Rupture, or the ability of those

impacted by the dam failure to claim full redress through Fundação Renova (a private non-profit

foundation, described below) or through the appropriate courts.

8.      Notwithstanding the Brazilian RJ Proceeding, due to the international nature of

certain of its debt and assets, Samarco remains vulnerable to creditor actions outside of Brazil,

including in the United States. Accordingly, the Foreign Representative commenced the Chapter

15 Case to obtain recognition of the Brazilian RJ Proceeding as a foreign main proceeding and

seeks other relief in support of its restructuring efforts.

9.      Brazil is the proper venue for the main restructuring proceeding of Samarco, as

Brazil is unquestionably where Samarco has its center of main interests ("COMI"). As explained in

detail below, Samarco maintains its registered office in Brazil and, as such, Samarco is entitled to

a presumption that its COMI is in Brazil. There is no relevant evidence to rebut this

presumption. To the contrary, there is overwhelming evidence that further bolsters the

presumption that Samarco's COMI is in Brazil, including that Brazil is the site of Samarco's headquarters and its operations, its primary assets, and its management.  Samarco files its taxes in Brazil, decisions regarding its operations are made in Brazil, Brazilian law governs the overwhelming majority of Samarco's procurement contracts, and creditors have been on notice and would expect that Samarco's COMI is in Brazil.  Accordingly, Petitioner respectfully submits that the Brazilian RJ Proceeding should be recognized as a foreign main proceeding.

## **BACKGROUND**

### A.    **General Background and History**

#### i.    *Overview*

10.    Samarco is a Brazilian company headquartered in Belo Horizonte.  It has two primary operating units, the Germano Complex and the Ubu Complex, which are both located in Brazil.  Samarco's primary activity is the mining, processing, and sale of iron ore pellets to Brazilian and international customers.  Samarco also generates certain of its revenues through (i) operation and activities related to transportation and navigation within its ports; (ii) production and sales of electric energy; and (iii) trading of coal.

11.    As of the RJ Petition Date, a significant portion of Samarco's financial indebtedness was denominated in U.S. Dollars and governed by New York law instruments. These instruments include three series of notes issued by Samarco under certain indenture agreements entered into in 2012, 2013, and 2014 (collectively, the "Samarco Notes"), each of which is governed by New York law, and seven export pre-payment facilities ("EPPs"), which also are governed by New York law, and pursuant to which certain promissory notes have been issued.

12.    Samarco also has a significant portion of its debt denominated in Brazilian *reais*, including debt that the company owes to its Shareholders (i) under certain debentures governed

by Brazilian law and (ii) as a result of certain reimbursement obligations in respect of

contributions made by the Shareholders to Fundação Renova on behalf of Samarco given that

Samarco was unable to meet its funding obligations to Fundação Renova.

13.     Samarco's operational and economic activities are concentrated in Brazil.

Additionally, the vast majority of Samarco's procurement contracts are governed by Brazilian

law.  As discussed below in greater detail, Samarco's two operating units from which it

generates its revenues are located in the Brazilian municipalities of Mariana and Ouro Preto,

both in the State of Minas Gerais (the Germano Complex), and in the municipality of Anchieta

in the State of Espírito Santo (the Ubu Complex).

14.     As of the RJ Petition Date, Samarco had approximately 1,600 direct workers,

almost all of whom are based and work in Brazil.  Samarco's headquarters and its senior

management are located in Belo Horizonte, where Samarco also makes its requisite tax filings.

All of Samarco's officers (*diretores*) are Brazilian.  Samarco's board meetings take place in

Brazil.

*ii.     Samarco's Corporate Structure and Offices*

15.     Samarco's organizational structure is as follows:



16.     Samarco's operational management center is located at its headquarters in Belo

Horizonte, Brazil (the "Belo Horizonte Office").  Samarco's senior management makes decisions

from the Belo Horizonte Office.  Samarco's officers include (i) Rodrigo Alvarenga Vilela,

President and Operations Director; (ii) Cristina Morgan Cavalcanti, Chief Financial Officer; and (iii) Reuber Luiz Neves Koury, Planning and Projects Director, all of whom are located in Brazil. Moreover, Samarco's primary operational activities all take place in Brazil, where the company is subject to significant Brazilian legal and regulatory regimes.

17.      As discussed below, Samarco's two operating units are located in the Brazilian States of Minas Gerais and Espírito Santo.  Before the Fundão Dam Rupture, Samarco was a key contributor to the economy of these states.  When Samarco was at its operational peak, the company directly accounted for about 6.4% and 1.5% of the gross domestic products of the States of Espírito Santo and Minas Gerais, respectively.

18.      As explained above, as of the RJ Petition Date, Samarco directly employed approximately 1,600 individuals, with the vast majority (over 99%) located in Brazil.  As of the RJ Petition Date, Samarco had no more than two employees located outside Brazil.  Samarco's strong employee base is essential to preserving operational stability, safety, and efficiency, which, in turn, are necessary to maximize and maintain the value of the Debtor over the course of the Brazilian RJ Proceeding.

**B.      Samarco's Capital Structure**

>        *i.      Operating Assets*

19.      Samarco's operating units – the Germano Complex and the Ubu Complex—are located in Brazil.  The Germano Complex contains three concentrators for the extraction and processing of iron ore, a processing plant and a new filtration plant.  The Ubu Complex contains four pelletizing plants and a port terminal.

20.      Samarco owns three pipelines, which transport iron ore concentrate between the Germano Complex and the Ubu Complex.  The route of the pipeline crosses twenty-five local municipalities across Minas Gerais and Espírito Santo.  In addition, Samarco owns a

hydroelectric power plant located in Muniz Freire, Brazil, and has a 49% interest in a consortium

that owns the Guilman-Amorim hydroelectric power plant, which is located between the

municipalities of Antônio Dias and Nova Era, Brazil.

     *ii.   Liabilities*[5]

21.     As of the RJ Petition Date, a significant portion of Samarco's financial

indebtedness was denominated in U.S. Dollars and was governed by New York law instruments

(*i.e.*, the Samarco Notes and the EPPs).

22.     Samarco also has a significant portion of its debt denominated in Brazilian *reais*,

including debt that the company owes to its Shareholders (i) under certain debentures governed

by Brazilian law and (ii) as a result of certain reimbursement obligations in respect of

contributions made by the Shareholders to Fundação Renova on behalf of Samarco.

     a)  <u>Samarco Notes</u>

23.     As set forth in the RJ Petition, the aggregate amount outstanding under the

Samarco Notes was approximately $2.7 billion, comprising amounts outstanding under the

4.125% Notes due 2022 (the "<u>2022 Notes</u>"), the 5.75% Notes due 2023 (the "<u>2023 Notes</u>"), and

the 5.375% Notes due 2024 (the "<u>2024 Notes</u>").  Pursuant to the terms of the Samarco Notes'

offering documents, the creditors of Samarco have been on full notice that any restructuring of

their obligations could take place in Brazil and their investment was made with the expectation

that their purchases would be repaid with revenues earned from operations subject to Brazilian

legal and regulatory regimes.  For example, the offering memoranda for each series of Samarco

Notes specifically states that Samarco is a "corporation organized under the laws of the

---

[5]     For the avoidance of doubt, nothing herein constitutes or shall be construed as an admission of any purported liability with respect to any obligation, including financial indebtedness or claims, for which the Debtor reserves all rights and defenses.

Federative Republic of Brazil" and that judgments against Samarco would have to be enforced in Brazil.[6]  The offering memoranda for certain of the Samarco Notes further state "[i]f we are unable to pay our indebtedness, including our obligations under the notes, we may become subject to a bankruptcy proceedings in Brazil."[7]  The offering memoranda also explain that, under certain circumstances under Brazilian insolvency law, "all of our debt obligations that are denominated in foreign currency, including the notes, [could] be converted into Brazilian *reais* at the prevailing exchange rate on the date of declaration of bankruptcy by the court."[8]

24.    Similarly, the indentures for the Samarco Notes make repeated reference to Brazilian rules, regulations, institutions, and other Brazilian legal concepts.  For example, Samarco's notice address is the Belo Horizonte Office in Brazil.[9]  The indentures also provide that Samarco "shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law."[10]  Notably, the indentures' definition of "Bankruptcy Law" includes both the Brazilian Bankruptcy Law and title 11 of the United States Code.[11]  The definition of "GAAP" in the Samarco Notes also references primarily Brazilian accounting rules.[12]

b)  EPP Agreements

25.    Samarco is party to seven EPPs with a variety of lending institutions and, as of the RJ Petition Date, the aggregate principal and interest amounts outstanding under the EPPs was

---

[6]     Offering Memorandum for 2022, 2023 and 2024 Notes at ix.

[7]     Offering Memorandum for 2022 Notes at 29; Offering Memorandum for 2023 Notes at 31.

[8]     Offering Memorandum for 2022 Notes at 29; Offering Memorandum for 2023 Notes at 31.

[9]     Bond Indentures for 2022, 2023 and 2024 Notes at 58.

[10]    *Id.*

[11]    Bond Indentures for 2022, 2023 and 2024 Notes at 2.

[12]    Bond Indentures for 2022, 2023 and 2024 Notes at 5.

approximately $1.924 billion.  Three of the EPPs contemplate certain collection accounts based in New York, New York.

**C.    Events Precipitating Commencement of the Brazilian RJ Proceeding**

        *i.    Fundão Dam Rupture*

26.    As noted above, on November 5, 2015, a tailings dam owned by Samarco at the Germano Complex in the municipality of Mariana failed.  After the Fundão Dam Rupture, Samarco's operating permits in Minas Gerais were suspended and, consequently, its mining operations ceased.  By August 2016, due to the cessation of its mining operations, Samarco was forced to suspend payments related to its financial indebtedness.

27.    Samarco has concentrated its efforts on managing the impact of the Fundão Dam Rupture, including through significant social and environmental remediation initiatives. Samarco provided significant emergency assistance to the affected population (offering housing and financial aid) and is obliged, including as a result of numerous judicial and extra-judicial agreements, to make full redress for the damage caused by the Fundão Dam Rupture. Additionally, Samarco committed to maintaining the wages and other labor costs for its workers in the area and committed not to terminate the labor contracts of such workers.

28.    As of the RJ Petition Date, Samarco has entered into at least twenty-four agreements relating to the Fundão Dam Rupture, including agreements aimed at (i) assisting the various municipalities affected by the Fundão Dam Rupture; (ii) implementing initiatives to protect and rescue animals; and (iii) implementing initiatives to protect and recover the historical and cultural heritage of the areas impacted by the flooding.

29.    The primary agreement is the Transaction and Conduct Adjustment Agreement, entered into on March 2, 2016, between Samarco, Vale and BHP Brasil, the Brazilian federal government, the States of Minas Gerais and Espírito Santo, and other government authorities

(the "TTAC"), which provides for the reparation of the damage resulting from the Fundão Dam

Rupture.  The TTAC created Fundação Renova, a private non-profit foundation responsible for

developing and implementing forty-two social, economic, and environmental reparation

programs and projects.  Under the TTAC, Samarco has an obligation to fund these programs and

projects as the principal obligor.[13]

30.    The TTAC was supplemented by three additional agreements executed with

governmental entities and authorities:  (i) the Preliminary Adjustment Agreement (the "TAP");

(ii) the amendment to the TAP (the "ATAP"); and (iii) the governance agreement (the

"Governance TAC").  In broad terms, pursuant to the TAP, ATAP, and Governance TAC,

Samarco, Vale, and BHP Brasil confirmed their commitment to redress the damages resulting

from the Fundão Dam Rupture, agreed to fund technical experts to support the public authorities,

and agreed to adjust the governance of the reparation process to enhance public participation,

among others.  These agreements were executed within the scope of public civil actions number

69758.61-2015.4.01.3400 and 23863-07.2016.01.3800 filed by the Brazilian Federal Union, the

States of Minas Gerais and Espírito Santo and the Public Prosecutors Office, after a broad debate

and participation of public authorities and the affected communities, and the commitment of

Samarco to the full redress of socio-economic and socio-environmental damages resulting from

the Fundão Dam Rupture.

*ii.    Enforcement Actions in the United States*

31.    On September 2, 2020, The Bank of New York Mellon, in its capacity as Trustee

for each of the Samarco Notes (the "Trustee"), commenced three civil actions against Samarco in

the New York State Supreme Court, Commercial Division, New York County, seeking to

---

[13]      Pursuant to clause 237 of the TTAC, Samarco is the principal obligor in respect of the obligations to fund
the Fundação Renova and its Shareholders have secondary funding obligations.

recover amounts allegedly due and owing under the Samarco Notes and related indenture

agreements, each of which is governed by New York law, including unpaid principal and missed

and accrued interest in the aggregate amount of approximately $2.7 billion (together, the

"Trustee Litigation").[14]

32.    On November 13, 2020, Samarco filed a motion to dismiss, or in the alternative

stay, the Trustee Litigation, asserting that the Trustee had failed to properly serve Samarco and

that the District Court should stay the Trustee Litigation for a limited time both as a matter of its

inherent authority and as a matter of comity given Samarco's need to restructure its debt (the

"Motion to Dismiss").  The Motion to Dismiss was fully briefed as of December 8, 2020.[15]  That

same day, the Trustee moved for an order of prejudgment attachment and for expedited

discovery (the "Prejudgment Attachment Motion").[16]  The Prejudgment Attachment Motion

seeks an order permitting the Trustee to attach more than $2 billion in Samarco's assets, as well

as expedited discovery to identify the location of assets for attachment.  The Prejudgment

Attachment Motion was fully briefed as of January 4, 2021, and oral argument was originally

scheduled for April 20, 2021.[17]  Shortly after the commencement of the Brazilian RJ Proceeding,

the District Court scheduled a status conference, which occurred on April 13, 2021.[18]  At that

---

[14]    *See The Bank of New York Mellon v. Samarco Mineração S.A.*, Case No. 654214/2020, Case No. 654215/2020, and Case No. 654216/2020 (N.Y. Sup. Ct. Sept. 2, 2020), ECF No. 3.  On October 2, 2020, Samarco removed each of the Trustee's three parallel suits against Samarco to the United States District Court for the Southern District of New York (the "District Court"), where the cases are currently pending.  *See The Bank of New York Mellon v. Samarco Mineração S.A.*, Case No. 20-08206, Case No. 20-08209, and Case No. 20-08211 (JPC) (S.D.N.Y., Oct. 2, 2020), ECF No. 1.

[15]    *See id.*, ECF Nos. 35, 36, 35, respectively.

[16]    For the avoidance of doubt, Samarco maintains that the Trustee is not entitled to the relief sought by the Prejudgment Attachment Motion and continues to reserve all of its rights and defenses with respect to that Motion and the Trustee Litigation.

[17]    *See supra* n.12, ECF Nos. 41, 42, 41 respectively.

[18]    *See id.*, ECF Nos. 45, 46, 45 respectively.

conference, the District Court determined that it would adjourn the previously scheduled oral

argument and further consideration of the parties' pending motions until this Court considered

Samarco's request for recognition of the Brazilian RJ Proceeding as a foreign main proceeding.

As a result, the District Court has not yet issued a decision on either the Motion to Dismiss or the

Prejudgment Attachment Motion.

     *iii.* *Enforcement Actions in Brazil*

   33.  On February 8, 2021, York Global Finance BDH, LLC ("York"), a holder of a

promissory note issued by Samarco under one of the EPPs (the "York Note"), filed an execution

lawsuit (the "York Execution Lawsuit") with a court in the Brazilian state of Minas Gerais (the

"Minas Gerais Court"), requesting the enforcement of $125 million in asserted debt related to a

certain EPP executed on December 3, 2013 between Samarco and Mizuho Bank (the "York

EPP").  York sought an order compelling Samarco to pay on the York Note within three days

and, in case of default, an order permitting the seizure of Samarco's financial assets in an amount

sufficient to repay the debt through the national judiciary financial assets online search system

("SISBAJUD").  On March 4, 2021, Samarco filed a motion requesting that certain of Samarco's

real estate and movable assets be attached to secure the claims that York is seeking to enforce

through the York Execution Lawsuit.  On March 5, 2021, York objected to Samarco's motion.

   34.  On March 22, 2021, the Minas Gerais Court entered an order denying York's

request for an asset freeze and accepting the assets offered by Samarco as collateral to secure

York's claims.  York appealed and requested an injunctive relief to an appellate court to stay the

effects of the lower court's decision and to order the attachment of Samarco's financial assets

and revenue.  On April 8, 2021, the appellate court granted York's injunctive relief to order the

lower court to attach certain of Samarco's financial assets by directing the Brazilian Central

Bank and certain financial institutions to freeze Samarco's Brazilian bank accounts and deposits through SISBAJUD. On the same date, the lower court was notified of the decision and ordered York to pay court fees for inserting the attachment order through SUSBAJUD.

35.     On March 31, 2021, Bank of America, N.A. ("BOFA") filed an execution lawsuit with the 26th Civil Court of the City of São Paulo (the "São Paulo Court" and such lawsuit, the "BOFA Execution Lawsuit") against Samarco, seeking the repayment of $200 million of debt under two promissory notes issued by Samarco in connection with an EPP that was executed in 2013. On March 31, 2021, the São Paulo Court entered an order requiring Samarco to pay the debt due under the two promissory notes within three days of receipt of service of process. Samarco received summons in respect of the BOFA Execution Lawsuit on April 8, 2021.

36.     On April 9, 2021, HSBC Bank PLC ("HSBC") filed an execution lawsuit with the 19th Civil Court of the City of São Paulo (the " HSBC Execution São Paulo Court" and such lawsuit, the "HSBC Execution Lawsuit") against Samarco, seeking the repayment of $250 million of debt, related to two promissory notes issued in connection with an EPP executed on December 2, 2013 between Samarco and HSBC Bank USA N.A. Samarco has not yet received summons in respect of the HSBC Execution Lawsuit.

37.     As a result of the ongoing enforcement actions, Samarco had no choice but to commence the Brazilian RJ Proceeding.

                    iv.     *Restructuring Process and Future Outlook*

38.     Due to the economic impact of the Fundão Dam Rupture, Samarco cannot support its current level of financial indebtedness. Despite Samarco's constructive efforts to negotiate an orderly restructuring of certain of its financial indebtedness as described above, *see supra* at ¶ 6, on April 9, 2021, Samarco had no choice but to commence the Brazilian RJ Proceeding in Brazil

to stay enforcement actions from its financial creditors in Brazil and in the United States and in particular to avoid any attachment of its financial assets, which would severely impact its recently resumed operations. With the Brazilian RJ Proceeding—as aided by this Chapter 15 Case—Samarco will have the opportunity to negotiate and implement an orderly restructuring that will enable it to emerge as a financially sustainable stand-alone project, rebuild its business and continue the employment of its workers and benefit local stakeholders. The Brazilian RJ Proceeding does not impair Samarco's obligations, commitment, or ability to make full redress for the Fundão Dam Rupture, or the ability of those impacted by the dam failure to claim full redress through the Fundação Renova or the appropriate courts. Once Samarco completes its reorganization, it plans to return to its prior position as a strong exporter and to continue to advance the economic activity in Brazil and benefit local stakeholders.

**D.    The Current Brazilian RJ Proceeding and Foreign Representative Appointment**

39.    As explained above, Samarco filed the RJ Petition to commence the Brazilian RJ Proceeding on April 9, 2021.[19] The RJ Petition does not (i) impair, or in any way change, the ability of the parties affected by the Fundão Dam Rupture to file claims against Samarco; (ii) prevent any party from taking advantage of the agreements (such as the TTAC) and programs offered by the Fundação Renova; or (iii) impair any existing or future claims related to the Fundão Dam Rupture, which may not be covered by the existing agreements or programs. The Brazilian Court entered the RJ Acceptance Order accepting Samarco's application.[20] The RJ Acceptance Order also suspended all actions and/or executions in progress against Samarco (except the ones related to damages resulting from the Fundão Dam Rupture and other actions

---

[19]    *See* Ex. B.

[20]    *See* Ex. C.

that are not subject to the RJ pursuant to Brazilian law) including any executions against

Samarco's assets, and granted a provisional injunction suspending the York and BOFA

Execution Lawsuits and prohibiting any new attachment orders.  Ex. C at ¶¶ 20, 29(e).  The RJ

Acceptance Order addressed other RJ formalities, such as appointing a judicial administrator, the

disclosure of public notice regarding the RJ Acceptance Order and the list of creditors subject to

the judicial reorganization and providing instructions regarding required notices to certain

interested parties.  *Id*. at ¶¶ 29(a), (g)–(j).

40.    Pursuant to a duly executed resolution of appointment issued by Samarco's board

of directors dated April 12, 2021 (the "<u>Resolution</u>"), the Foreign Representative has been

(i) appointed to act as the foreign representative of Samarco's Brazilian RJ Proceeding for

purposes of this Chapter 15 Case, and (ii) authorized to commence this Chapter 15 Case.[21]

### E.    <u>Connections to the United States</u>

41.    Samarco has property in the United States, including amounts held in certain

collateral accounts, as well as a bank account with JPMorgan Chase, each of which is located in

New York.  Samarco also is currently party to certain litigation proceedings in the United States.

Specifically, the Trustee Litigation is pending before the District Court.  This matter is described

in further detail above in paragraphs 31 through 32, *supra*.

42.    Finally, certain of Samarco's outstanding debt, including each of the indentures

governing the Samarco Notes and the EPPs, is governed by New York law, and, upon

information and belief, certain holders of that debt have headquarters or significant operations in

the borough of Manhattan.

---

[21]    A true and correct copy of the Resolutions authorizing the commencement of the Chapter 15 Case and appointing the Foreign Representative are attached hereto as <u>Exhibit D</u> and <u>Exhibit E</u>, respectively., along with certified English translations.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and 11 U.S.C. § 1501 as well as the Amended Standing Order of Reference dated January 31,

2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y.

Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing Order").

44.     This Chapter 15 Case has been properly commenced in accordance with sections

1504 and 1509(a) of the Bankruptcy Code by the filing of the Verified Petition.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

45.     Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) as the principal

U.S. assets of the Debtor are located within New York County and thus within this District.

## REQUIRED DISCLOSURES

46.     The Petitioner hereby provides the following disclosures in accordance with Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

- the following disclosure identifies for the Court any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the Debtor's equity interests:

    a.  50% of Samarco's equity is directly owned by Vale S.A.

    b.  50% of Samarco's equity is directly owned by BHP Billiton Brasil Ltda.

- Other than the Verified Petition, the Debtor does not have a pending petition with this Court for relief under any chapter of the Bankruptcy Code.

- The Brazilian RJ Proceeding is the only foreign proceeding, as that term is defined in section 101(23) of the Bankruptcy Code, of the Debtor presently open at the time of commencement of these Chapter 15 Cases.

- Aside from the Petitioner with respect to the Chapter 15 Case (and Cescon, Barrieu, Flesch & Barreto Advogados and Vilas Boas, Lopes e Frattari Advogados (together, "Brazilian Counsel") with respect to the Brazilian RJ Proceeding), no other persons are presently authorized to administer foreign proceedings of the Debtor at this time.

- Samarco is party to certain litigation in the United States that either is pending or for which the period for further appeal has not run as of the date of the commencement of this Chapter 15 Case. The cases are:

    a. *The Bank of New York Mellon v. Samarco Mineração S.A.*: Samarco is party to three parallel litigations pending in the District Court. On September 2, 2020, the Trustee commenced three civil actions against Samarco in the New York State Supreme Court, Commercial Division, New York County, seeking to recover amounts allegedly due and owing under the Samarco Notes and related indenture agreements, including unpaid principal and missed and accrued interest in the aggregate amount of approximately $2.7 billion.[22] On October 2, 2020, Samarco removed each of the Trustee's suits to the District Court, where the cases are currently pending.[23] On November 13, 2020, Samarco filed a motion to dismiss, or in the alternative stay, the Trustee Litigation, asserting that the Trustee had failed to properly serve Samarco and that the court should stay the Samarco Notes Litigation for a limited time both as a matter of its inherent authority and as a matter of comity given Samarco's need to restructure its debt. On December 8, 2020, the Trustee moved for an order of prejudgment attachment and for expedited discovery. In broad terms, the Prejudgment Attachment Motion seeks an order permitting the Trustee to attach more than $2 billion in Samarco's assets, as well as expedited discovery to identify the location of assets for attachment.[24] The Prejudgment Attachment Motion was fully briefed as of January 4, 2021.[25] Shortly after the commencement of the Brazilian RJ Proceeding, the District Court scheduled a status conference, which occurred on April 13, 2021.[26] At that conference, the District Court determined that it would adjourn the previously scheduled oral argument and further consideration of the parties' pending motions until this Court considered Samarco's request for recognition of the Brazilian RJ Proceeding as a foreign main proceeding. As a result, the District Court has not yet issued a decision on either the Motion to Dismiss or the Prejudgment Attachment Motion.

    b. *Banco Safra S.A.- Cayman Islands Branch v. Samarco Mineração S.A.* (the "Securities Litigation"): Samarco was named as a defendant in a putative securities class action initially filed in the District Court, initiated

---

[22]    *See The Bank of New York Mellon v. Samarco Mineração S.A*, Case No. 654214/2020, Case No. 654215/2020, and Case No. 654216/2020 (N.Y. Sup. Ct. Sept. 2, 2020), ECF No. 3.

[23]    *See The Bank of New York Mellon v. Samarco Mineração S.A*, Case No. 20-08206, Case No. 20-08209, and Case No. 20-08211 (JPC) (S.D.N.Y. Oct. 2, 2020), ECF No. 1.

[24]    *See id.*, ECF Nos. 32, 33, 31, respectively.

[25]    *See id.*, ECF Nos. 41, 42, 41, respectively.

[26]    *See id.*, ECF Nos. 45, 46, 45 respectively.

in the aftermath of the Fundão Dam Rupture.[27]  On June 18, 2019, the
District Court granted Samarco's motion to dismiss with prejudice,
holding that the plaintiff failed to allege a necessary "domestic" U.S.
securities transaction.[28]  On November 27, 2019, plaintiff appealed the
dismissal to the Second Circuit.[29]  Briefing was completed on June 29,
2020, and oral argument was held on January 13, 2021.[30]  On March 4,
2021, the Second Circuit issued a Summary Order affirming the District
Court's dismissal of plaintiff's claims with prejudice and the mandate
issued on March 25, 2021.[31]

## BASIS FOR RELIEF REQUESTED

47.    The Court should grant the Verified Petition and recognize the Brazilian RJ

Proceeding as the foreign main proceeding for Samarco.  Chapter 15 of the Bankruptcy Code

was specifically designed to assist foreign representatives such as the Petitioner in the

performance of her duties.  A central goal of Chapter 15 is to "provide effective mechanisms for

dealing with cases of cross-border insolvency while promoting international cooperation, legal

certainty, fair and efficient administration of cross-border insolvencies, protection and

maximization of debtors' assets, and the rescue of financially troubled businesses."  *In re*

*Fairfield Sentry Ltd.*, 714 F.3d 127, 132 (2d Cir. 2013) (citing 11 U.S.C. § 1501(a)) (internal

quotation marks omitted).  Each of the procedural requirements of section 1515 of the

Bankruptcy Code are satisfied, as is set out in section A below.  Notably, the Petitioner is the

duly appointed "foreign representative" of the Brazilian RJ Proceeding with respect to the

Debtor, and it is well-established that Brazilian RJ proceedings are considered "foreign

---

[27]    *Banco Safra S.A. - Cayman Islands Branch v. Samarco Mineração S.A.*, No. 16 Civ. 8800 (RMB), 2019
WL 2514056, at *2 (S.D.N.Y. June 18, 2019).

[28]    *Id.* at *2, *4, *6.

[29]    *Banco Safra S.A.- Cayman Islands Branch v. Samarco Mineração S.A.*, Case No. 19-3976, ECF No. 1.

[30]    *Banco Safra S.A.- Cayman Islands Branch v. Samarco Mineração S.A.*, Case No. 19-3976, ECF Nos. 94,
106.

[31]    *Banco Safra S.A.- Cayman Islands Branch v. Samarco Mineração S.A.*, Case No. 19-3976, ECF Nos. 118,
124.

proceedings" for the purposes of chapter 15. Further, the Debtor's COMI unquestionably is in

Brazil, given that the Debtor is incorporated in Brazil and all of the Debtor's operations have

taken place and remain in Brazil.

48.    In the alternative, although Samarco is confident that the Brazilian RJ Proceeding

is a foreign main proceeding within the definition of section 1502(4) of the Bankruptcy Code, if

this Court declines to recognize the Brazilian RJ Proceeding as the foreign main proceeding,

Samarco is eligible for nonmain recognition and relief, on the basis set out in section C below, to

ensure a comprehensive restructuring.

**A.    The Brazilian RJ Proceeding is a Foreign Proceeding of Samarco and the Petitioner is the Duly-Authorized Foreign Representative Thereof and has Properly Petitioned this Court for Recognition**

49.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing,

the Court shall enter an order recognizing a foreign proceeding if (i) the petition meets the

requirements of section 1515 of the Bankruptcy Code; (ii) the foreign representative applying for

recognition is a person or body; and (iii) such foreign proceeding is a foreign main proceeding or

nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code. *See* 11 U.S.C.

§ 1517(a); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 653 (Bankr. S.D.N.Y.

2016). These foregoing requirements are satisfied with respect to the Brazilian RJ Proceeding,

the Petitioner, and the Verified Petition.

> *i.    The Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code*

50.    Each of the procedural requirements of section 1515 of the Bankruptcy Code is

satisfied. First, the Petitioner properly commenced the Chapter 15 Case in accordance with

sections 1504 and 1509(a) of the Bankruptcy Code by filing the Verified Petition. *See In re Bear*

*Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr.

S.D.N.Y. 2007) (hereinafter "Bear Stearns I"), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) (hereinafter

"Bear Stearns II").  Second, the Petitioner has submitted all documents and other information

required by section 1515(b) of the Bankruptcy Code:  a certified copy of the decision

commencing the Brazilian RJ Proceeding and a certified copy of the Resolution appointing the

Petitioner as the foreign representative of the Brazilian RJ Proceeding, together with English

translations of the same where applicable and as required by section 1515(d) of the Bankruptcy

Code.  Finally, the Petitioner has submitted in this Verified Petition all information required by

section 1515(c) of the Bankruptcy Code (*i.e.*, a statement by the Petitioner identifying any other

foreign proceedings known to the Petitioner with respect to Samarco), together with all other

required disclosures regarding the Debtor in accordance with Bankruptcy Rules 1007(a)(4) and

7007.1.  *See supra* ¶ 45.  Accordingly, the requirements of section 1515 of the Bankruptcy Code

are satisfied.

> ii.    *The Petitioner is Samarco's duly-appointed "foreign representative" of the Brazilian RJ Proceeding*

51.    Section 1517(a) of the Bankruptcy Code also requires that a foreign representative

applying for recognition be a person or body.  *See* 11 U.S.C. § 1517(a)(2).  Here, the Petitioner is

an individual, which is included in the term "person," 11 U.S.C. § 101(41), who has been duly

(i) appointed to act as Samarco's foreign representative in respect of the Brazilian RJ Proceeding

for purposes of the Chapter 15 Case, and (ii) authorized to commence the Chapter 15 Case.  *See*

Exs. D, E at 5.2-5.3.  As explained in the Brazilian Counsel Declaration, Brazilian Bankruptcy

Law authorizes the Debtor to administer the reorganization of its assets and affairs, and to run its

business during the course of the Brazilian RJ Proceeding.  Brazilian Counsel Decl. ¶ 18.

Samarco's board of directors duly appointed the Petitioner to serve as the foreign representative

in this Chapter 15 Case in conjunction with the Brazilian RJ Proceeding, and thus sections

101(24) and 1517(a)(2) of the Bankruptcy Code are satisfied. *See In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) (finding a foreign representative appointed pursuant to resolution of the debtors' boards is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code and thus meets the requirements of 1517(a)(2) of the Bankruptcy Code); Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re Oi S.A.*, Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; *In re OAS S.A.*, 533 B.R. 83, 93-95 (Bankr. S.D.N.Y 2015) (holding that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative).[32]

   iii.   *The Brazilian RJ Proceeding is a foreign proceeding*

52.     The Brazilian RJ Proceeding is a "foreign proceeding," as required under section 1517(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(1) (requiring as a condition to the entry of a recognition order, the Brazilian RJ Proceeding must be a foreign main proceeding or nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code). A "foreign proceeding" is (i) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt; (ii) pending in a foreign country; (iii) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court; and (iv) for the purpose of reorganization or liquidation.[33] *See* 11 U.S.C. § 101(23). The Bankruptcy Code defines "foreign

---

[32]     *See also In re Vitro, S.A.B. de C.V.*, 470 B.R. 408 (Bankr. N.D. Tex. 2012), *aff'd*, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates self-management by the debtor during the proceeding similar to that of a debtor-in-possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the individual as the foreign representative).

[33]     Some bankruptcy courts have separated the four statutory factors into seven elements, including (i) the existence of a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

court" as "a judicial or other authority competent to control or supervise a foreign proceeding."
11 U.S.C. § 1502(3).

53.     The Brazilian RJ Proceeding meets each factor for a "foreign proceeding"—as discussed in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding is a "collective" judicial insolvency proceeding involving the treatment of multiple creditors and claims together rather than attempting to resolve two-party disputes.  *See* Brazilian Counsel Decl. ¶ 7. Furthermore, an RJ restructuring plan is intended to directly or indirectly benefit all creditors collectively and must be approved by a required majority of each class of claims.  *Id.* ¶ 30.  The Brazilian RJ Proceeding is a proceeding pending in Brazil, a foreign country, where the assets and affairs of Samarco are subject to the control and supervision by the Brazilian Court for purpose of reorganization or liquidation.  *See id.* ¶ 7.  Moreover, courts have routinely held Brazilian RJ Proceedings under the Brazilian Bankruptcy Law (and other Brazilian restructuring laws) squarely meet the definition of a "foreign proceeding" both as defined in the Bankruptcy Code and interpreted by bankruptcy courts.  *See, e.g.*, Order Granting Recognition And Final Relief In Aid Of A Foreign Proceeding, *In re Odebrecht Engenharia e Construção S.A.*, Case No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020); Revised Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re Odebrecht, S.A., et al.*, Case No. 19-12731 (SMB) (Bankr. S.D.N.Y. Oct. 4, 2019); *Serviços de Petróleo Constellation*, 600 B.R. at 270 ("Courts in this Circuit have long agreed that the Brazilian RJ process satisfies these standards."); *In re Oi S.A.*, Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; *In re OAS S.A.*, 533 B.R. at 83.  The same conclusion applies here.

---

(vii) which proceeding is for the purpose of reorganization or liquidation.  *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (Bankr. S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)).

### B.  The Court Should Find that the Brazilian RJ Proceeding Is a "Foreign Main Proceeding"

54.     The Brazilian RJ Proceeding is also the "foreign main proceeding" of the Debtor because it is pending in Brazil, which is Samarco's COMI.  *See* 11 U.S.C. § 1502(4); 11 U.S.C. § 1517(b)(1) (a foreign main proceeding is the foreign proceeding subject to the petition "pending in the country where the debtor has the center of its main interests").

>   i.   *A COMI analysis under U.S. law focuses on where a debtor's business interests are principally centered*

55.     Neither the Bankruptcy Code nor the UNCITRAL Model Law on Cross-Border Insolvency (the "Model Law") defines COMI.  However, there is a rebuttable presumption that a debtor's COMI is its "registered office."  11 U.S.C. § 1516(c).  Where any "evidence to the contrary" is presented, courts must "examine all of the evidence to determine where [debtor's] center of main interest lies."  *Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 595 (Bankr. S.D.N.Y. 2012).

56.     A COMI analysis looks at the debtor's substantive "locus of operations"— the center of its operations, purpose, function, and activities, among others.  *See Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F. Supp. 2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted).  Some courts interpret COMI to mean "principal place of business" to guide their COMI analysis.  *See, e.g.*, *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011).  However, the Second Circuit has noted "[g]iven Congress's choice to use COMI instead of 'principal place of business,' that concept [of principal place of business] does not control the analysis.  But to the extent that the concepts are similar, a court may certainly consider a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled."  *See Fairfield Sentry*, 714 F.3d at 138 n.10.

57.    Courts in this Circuit employ a list of nonexclusive factors adopted from *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) to rebut the "registered office" presumption or, where the presumption does not govern, to determine the location of a debtor's "locus of operations" for purposes of establishing its COMI.  They include:

> "[T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." . . . [the] "principal place of business" . . . [and] the expectations of third parties [as to the] debtor's COMI."

*Fairfield Sentry*, 714 F.3d at 137 (citing *In re SPhinX, Ltd.*, 351 B.R. at 117).  The Second Circuit added as additional possible factors "the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Id.* at 130.  These factors, the Second Circuit reasoned, are "in the public domain" and thus "ascertainable and not easily subject to tactical removal." *Id.* at 136-38 (noting the "importance of factors that indicate regularity and ascertainability"); *see also In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 912 (S.D. Fla. 2010) (finding that the "location of a debtor's COMI should be readily ascertainable by third parties").

58.    As explained above, Samarco's registered office and headquarters are in Belo Horizonte, Brazil.  *See supra* at ¶¶ 3,10.  Thus Samarco is entitled to the "registered office" presumption codified in section 1516(c) of the Bankruptcy Code that its COMI is in Brazil.  There is no relevant evidence to rebut this presumption and, in any event, an evaluation of the hallmark COMI factors further supports the presumption and a finding of Samarco's COMI in Brazil.

59.    First, those who actually manage Samarco are located in Brazil.  *See supra* ¶ 16.  Second, the vast majority of Samarco's employees and all of its officers are located and

work in Brazil, which is the location of effectively all of Samarco's operations. *Id.* ¶¶ 16–18.

Third, Samarco's operating assets, including the Germano Complex, the Ubu Complex, and the

three pipelines that connect the Germano Complex and the Ubu Complex are located in Brazil.

*Id.* ¶¶ 19–20.  Samarco's additional principal assets are based in Brazil including the

hydroelectric power plant in Muniz Freire, and its interest in the Guilman-Amorim hydroelectric

power plant consortium.  *Id.* ¶ 20.  Fourth, the offering documents for the Samarco Notes put

creditors on notice that any judgments against Samarco would have to be enforced in Brazil and

the Samarco Notes themselves contain multiple references to Brazilian rules, regulations,

institutions and other Brazilian concepts.  *Id.* ¶ 23–24.  Finally, Samarco is subject to Brazilian

legal and regulatory regimes.  *Id.* ¶ 16.

      60.    Thus, even if the "registered office" presumption were not conclusive of

Samarco's COMI (and, given the absence of contrary evidence, it is), the relevant factors

regarding Samarco's governance, operations, and capital structure further support a finding that

Samarco's COMI is in Brazil.  *See, e.g.*, *In re Olinda Star Ltd.*, 614 B.R. 28, 45, (Bankr.

S.D.N.Y. 2020) ("In addition to finding that [debtor's] registered office is in the BVI, the Court

finds that an analysis of the COMI factors also weighs in favor of a COMI in the BVI.

Accordingly, the Court holds that BVI Proceeding is recognized as a foreign main proceeding.");

*In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91-93 (Bankr. S.D.N.Y. 2012) (conducting a review

of COMI factors where the "registered office presumption" supported foreign main recognition

and finding that based on the COMI factors there was "virtually no evidence of record to the

contrary.") (internal quotation marks omitted).

**C. In the Alternative, the Court Should Find that the Brazilian RJ Proceeding is at Least a Foreign Nonmain Proceeding of the Debtor and Grant Discretionary Relief**

61.    As demonstrated above, the Brazilian RJ Proceeding should be recognized as the "foreign main proceeding."  Nevertheless, should this Court conclude that the Brazilian RJ Proceeding is not the foreign main proceeding, the Foreign Representative submits that, in the alternative, (i) the Brazilian RJ Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code and that, consequently, (ii) pursuant to section 1517(b)(2) of the Bankruptcy Code, discretionary relief should be granted, namely, the application of a protective stay to the full extent set forth in section 362 of the Bankruptcy Code with respect to Samarco and its U.S.-located property. 11 U.S.C. §§ 1517(b)(2), 1521(a)(6).

*i.    The factors for recognition of foreign nonmain proceedings under U.S. law*

62.    Courts recognize a foreign proceeding as a "foreign nonmain proceeding" where the debtor has an "establishment" in the foreign country where the proceeding is pending. "Establishment" is defined in the Bankruptcy Code as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).  Unlike COMI, chapter 15 of the Bankruptcy Code provides no evidentiary presumption as to whether a debtor has an establishment in a particular jurisdiction. *Bear Stearns II*, 389 B.R. at 338.  Thus, whether an "establishment" exists in a particular location is "essentially a factual question," *id.* at 338, and the petitioner bears the burden of proof. *Brit. Am.*, 425 B.R. at 915.

63.    The Bankruptcy Code does not define "nontransitory economic activity," and, as a Bankruptcy Court in this District has noted, "[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15." *Millennium Glob.*, 458 B.R. at 84.  Courts have interpreted the meaning of "establishment" in the context of the purpose of chapter 15 and the

Model Law, and by looking to the meaning ascribed to such term by foreign courts. *See, e.g.*, *Millennium Glob.*, 458 B.R. at 84 n.49; *Bear Stearns I*, 374 B.R. at 131 n.12. The limited number of U.S. courts to consider the question have determined a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise carries out a nontransitory economic activity in that jurisdiction. *See, e.g.*, *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311 (GBD), 2011 WL 4357421 at *10 n.8 (S.D.N.Y. Sept. 16, 2011) (describing an establishment as "a local place of business"); *Bear Stearns I*, 374 B.R. at 131; *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016); *British Am.*, 425 B.R. at 916. Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Glob.*, 458 B.R. at 85. A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *Creative Fin.*, 543 B.R. at 520; *British Am.*, 425 B.R. at 915 (same), evidenced by, among other things, "retain[ing] local counsel and a commitment of capital to local banks." *Millennium Glob.*, 458 B.R. at 85.

     ii.    *The Debtor has an establishment in Brazil and therefore qualifies for foreign nonmain recognition*

64. If the Court were to find that Brazil is not Samarco's COMI, the Court should still find that Samarco has an establishment in Brazil for purposes of chapter 15 recognition. The Petitioner submits that the foregoing evidence in support of finding that Samarco's COMI is in Brazil also provides conclusive evidence that Samarco has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction. *See supra* ¶¶ 57–58.

iii.    *The Court should grant the discretionary relief requested if the Debtor is granted nonmain recognition*

65.    If the Court finds that the Brazilian RJ Proceeding is a nonmain proceeding, then the Petitioner requests that the Court grant discretionary relief with respect to Samarco and its U.S.-located property pursuant to section 1521 of the Bankruptcy Code.  *See Serviços de Petróleo Constellation*, 600 B.R. at 293 ("Debtors who are recognized as participating in foreign nonmain proceedings may be afforded nearly identical relief as those recognized as operating in foreign main proceedings.").  The Petitioner submits that the foregoing evidence concerning Samarco, its assets and its prospects for an effective reorganization fully justifies such discretionary relief, which is critical for the maintenance of the status quo and the preservation of Samarco's going-concern value.

66.    To exercise its discretionary powers under section 1521 of the Bankruptcy Code, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).  Relief under section 1521 of the Bankruptcy Code will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31, Pt. 1, at 116.  A determination of sufficient protection requires a balancing of the respective parties' interests.  *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").

67.    Here, the balance of interests weighs decisively in favor of granting the relief requested.  First, recognition and the application of the stay will allow for the efficient and orderly administration of Samarco's assets and affairs in a centralized, organized proceeding,

thus protecting the interests of creditors and maximizing the value of assets.  Such relief will

help ensure equitable distribution of assets and prevent certain opportunistic creditors from

circumventing the Brazilian RJ Proceeding and commencing or continuing pending actions in the

United States at the expense of the broader process and body of interest holders.

68.    Furthermore, interested parties will have the ability to participate in the Brazilian

RJ Proceeding and assert their claims therein along with all similarly situated creditors.  As set

forth in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding affords significant

procedural protections to creditors and other stakeholders to ensure a fair and equitable process

by providing many of the same procedural safeguards present in chapter 11 of the Bankruptcy

Code.  *See* Brazilian Counsel Decl. ¶¶ 18–30, 38–40.  The stay will not bar or otherwise

disenfranchise parties from participating in the Brazilian RJ Proceeding, where each creditor's

right to be heard will remain unaffected.  Nor will the requested stay preclude a creditor that

feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for

"cause."  *See generally* 11 U.S.C. § 362(d).  Instead, the Petitioner merely seeks to prevent

creditors from attempting to end-run the Brazilian RJ Proceeding.  Accordingly, any prejudice to

creditors caused by the discretionary relief requested is extremely limited, and the imposition of

a stay is warranted.  *See, e.g.*, *Serviços de Petróleo Constellation S.A.*, 600 B.R. at 294

(extending the automatic stay within the territorial jurisdiction of the United States to debtor in a

foreign nonmain proceeding so that such debtor receives the same relief with regard to the

automatic stay as its affiliates who were found to be operating in a foreign main proceeding in

Brazil).

69.    Pursuant to section 1521(e) of the Bankruptcy Code, the standards for injunctive

relief apply to certain relief, including certain relief under 1521.  Injunctive relief is appropriate

where: (a) there is a likelihood of success on the merits, (b) there is an imminent irreparable

harm to the debtor's assets in the absence of an injunction, (c) the balance of harms tips in favor

of the petitioner, and (d) the public interest weighs in favor of an injunction. *See In re Lyondell*

*Chem. Co.*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009) (citing *In re Calpine Corp.*, 354 B.R.

45 (Bankr. S.D.N.Y. 2006), *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007)).  This standard is met here.

70.    Samarco commenced the Brazilian RJ Proceeding to effectuate a comprehensive

restructuring of its debt.  The Brazilian RJ Proceeding was accepted by the Brazilian Court on

April 12, 2021 and will be administered pursuant to the Brazilian Bankruptcy Law and in

accordance with Brazilian law.  There is risk that Samarco could suffer immediate and

irreparable harm if parties attempt to take enforcement actions to circumvent the Brazilian RJ

Proceeding.  *See, e.g.*, *In re Calpine Corp.*, 365 B.R. at 409 (a court may issue an injunction in

the bankruptcy context "where the action to be enjoined is one that threatens the reorganization

process"); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("irreparable harm is

present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims

and fair distribution of assets in a single, centralized forum" (quoting Alan N. Resnick & Henry

J. Sommer, Collier on Bankruptcy ¶ 304.05 (15th ed. 2003))).  The relief requested will not

impose substantial harm to creditors because it will preserve the status quo of Samarco's assets

and liabilities pending the approval of and recognition and enforcement in the United States of a

the Brazilian RJ Proceeding.  Lastly, the requested relief is consistent with the public policy

because it will facilitate Samarco's efforts to complete a court-supervised reorganization process

in Brazil in accordance with Brazilian law.

## NOTICE

71.     Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in Exhibit F annexed hereto (the "Notice List").  Contemporaneously with this Verified Petition, the Petitioner has filed an *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for an Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* and will provide such other or further notice as the Court directs in accordance with the order entered on that motion.

## NO PRIOR REQUEST

72.     No previous request for the relief requested herein has been made to this or any other court.

*[The remainder of this page is left blank intentionally]*

## <u>CONCLUSION</u>

WHEREFORE, the Petitioner respectfully requests that the Court: (i) grant the Verified

Petition and enter the Proposed Order annexed hereto as <u>Exhibit A</u> recognizing the Brazilian RJ

Proceeding as the foreign main proceeding for the Debtor and granting the requested relief in

connection therewith, and (ii) grant such other and further relief as the Court deems just and

proper.

Dated: April 19, 2021
      New York, New York

                          CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: */s/ Thomas S. Kessler*
      Richard J. Cooper, Esq.
      Thomas S. Kessler, Esq.
      CLEARY GOTTLIEB STEEN & HAMILTON
      LLP
      One Liberty Plaza
      New York, New York 10006
      T: 212-225-2000
      F: 212-225-3999
      (rcooper@cgsh.com)
      (tkessler@cgsh.com)

      *Attorneys for the Foreign Representative*
      *of Samarco Mineração S.A. - Em Recuperação*
      *Judicial*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Cristina Morgan Cavalcanti, declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of the Debtor with respect to the Brazilian RJ Proceeding for purposes of the Chapter 15 Case. I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto are true and accurate to the best of my knowledge, information and belief, and I respectfully represent as follows:

- I am the Chief Financial Officer at Samarco.

- On April 12, 2021, Samarco's board of directors among other things, (i) appointed me as the foreign representative of the Brazilian RJ Proceeding for the Debtor and authorized me to file the Verified Petition and to act on its behalf in the Chapter 15 Case (each, a "<u>Resolution of Appointment</u>"), and (ii) authorized the commencement of the Brazilian RJ Proceeding and the Chapter 15 Case with respect to the Debtor (all such resolutions and other authorizations or consents, collectively, together with the Resolutions of Appointment, the "<u>Resolutions</u>"). Accordingly, I am fully authorized and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon: (a) my review of relevant information, data and documents (including oral information) furnished to me by the Debtor's officers, directors, employees and professionals; or (b) my analyses of the information I have received on the Debtor's operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including Samarco's primary financial creditors and its Shareholders. I am an individual over the age of 18. If I am called to testify, I will do so competently and based on the facts set forth herein.

Executed in _____, Brazil
Dated: April _____, 2021

Respectfully Submitted,

DocuSigned by:

Cristina Morgan Cavalcanti

88F5C065E31D4C6

Cristina Morgan Cavalcanti, Chief Financial
Officer, Samarco Mineração S.A. - Em
Recuperação Judicial and Authorized
Foreign Representative of the Debtor